**GULF VENTURES III, INC., et al.**

**v.**

**GLACIER GENERAL ASSURANCE COMPANY, et al.**

Civ. A. Nos. 83–355, 83–3643.

United States District Court, E.D. Louisiana.

May 9, 1984.

---

F. Neelis Roberts, New Orleans, La., Roy M. Cascio, Gretna, La., Arthur Dumaine, New Orleans, La., for plaintiffs.

William B. Schwartz, New Orleans, La., for defendants.

BEER, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. This is a consolidated action for (a) damages brought by the plaintiffs, Gulf Ventures III, Inc. (Gulf Ventures), Wilfred Maise and South Louisiana Production Credit Association (SLPCA) against Glacier General Assurance Company (Glacier General) for an alleged breach of contract of marine insurance and (b) for foreclosure by SLPCA upon its Preferred Ship Mortgage on the M/V CAPTAIN COON. These findings and conclusions relate only to (a) above, the claims against the insurer, as the foreclosure action has been disposed of previously.

2. Glacier General is a corporation organized and existing under the laws of the State of Montana and is engaged in the business of marine insurance.

3. Standard Marine Underwriters, Inc. (SMU) is a corporation organized and existing under the laws of the State of Louisiana and, at all times pertinent hereto, was the general agent authorized to issue contracts of marine insurance in the name of Glacier General.

4. Wilfred D. Maise, his wife, Patricia Maise, and their daughter, Davida Maise Villarubia, are citizens of the State of Louisiana who reside in New Orleans, Louisiana. Wilfred Maise purchased the M/V CAPTAIN COON, a 75-foot shrimp boat, at a U.S. Marshall's sale in June 1979 for approximately $125,000.00. In January 1980, Wilfred Maise, his wife and his daughter formed the corporation of Gulf Ventures III, Inc. for the purpose of operating the shrimping vessel and in order to obtain financing on the vessel. The sole shareholders and officers of the corporation were Wilfred Maise, his wife and their daughter.

5. On April 10, 1980, Wilfred Maise executed a First Preferred Ship Mortgage over the M/V CAPTAIN COON in favor of SLPCA as security for an installment note of the same date in the principal amount of $197,170.00. This note was endorsed by Wilfred Maise, Patricia Maise and Gulf Ventures III, Inc.

6. On or about June 12, 1982, SMU issued on behalf of Glacier General a policy of marine insurance covering the hull and machinery of the M/V CAPTAIN COON. This was a "named perils" policy and covered, among other perils, against loss due to "barratry of the masters and mariners and of all other like perils, losses and misfortunes that have or shall come to the hurt, detriment or damage of said vessel, etc., or any part thereof". The named assured under the hull and machinery policy issued was Gulf Ventures and the loss-payee was SLPCA.

7. As Wilfred Maise also owned and managed a grocery store in New Orleans, he hired his brother, Clyde Patrick Maise, to be captain of the M/V CAPTAIN COON. Clyde Maise had been involved in the fish-

ing and shrimping industry for many years, had previously owned boats and was qualified to serve as master of the vessel. He performed this function throughout 1980 and 1981, but was forced to leave the vessel in March of 1982 when he suffered an injury to his knee.

8. From the inception of the mortgage by SLPCA on the M/V CAPTAIN COON, Wilfred Maise and Gulf Ventures were in arrears on payments. Specifically, the mortgage had actually accrued interest in 1980, 1981 and 1982, and no payments had been made to reduce the principal under the mortgage since September 1981.

9. In early June 1982, Clyde Maise, as the authorized operating agent of the vessel, enlisted the services of Bernard Maji to man and operate the vessel. Captain Maji was authorized to hire a crew which consisted of Abraham Parfait and Larry Kinart. The CAPTAIN COON was turned over to Maji and his crew, and they were instructed to contact Clyde Maise periodically by telephone at Wilfred Maise's grocery store in New Orleans, at the Balcony Lounge in Leeville, Louisiana, through an employee named Daisey who was a personal friend of Clyde Maise, or through a pocket pager number.

10. When the vessel returned to Leeville after an initial voyage of eight or nine days, Captain Maji departed and did not return. Abraham Parfait notified Daisey of Captain Maji's departure and she authorized the crew to continue to operate the vessel under the command of Parfait. Although Clyde Maise was not contacted regarding this decision by Daisey before the vessel departed with its two-man crew of Parfait and Kinart, Clyde Maise subsequently approved of the change of command.

11. Captain Parfait obtained fuel and ice on credit, departed Leeville and began shrimping along the coastal waters of Louisiana. Throughout June and early July 1982, Parfait complied with Clyde Maise's instructions to contact him and to advise him regarding the whereabouts and activities of the vessel.

12. On the weekend of July 4, 1982, Captain Parfait brought the vessel into Biloxi, Mississippi, and telephoned Clyde Maise advising him that they would be in port for several days. Clyde Maise drove to Biloxi with several acquaintances and met with Captain Parfait in the lounge of the motel. Though the testimony of Maise and Parfait is conflicting on this point, it appears that one of the individuals introduced by Maise to Parfait was Harlan Dawson.[1] Parfait was told that Dawson was a partner in the vessel and would be involved in their enterprize. Parfait turned over the vessel earnings from its latest catches and requested that Maise obtain replacement nets and other equipment for the vessel.

13. On Clyde Maise's instructions, the CAPTAIN COON took on fuel and ice and left Biloxi to begin shrimping back west. The vessel's next port of call was Venice, Louisiana, several days later, where Parfait sold his catch, resupplied and telephoned the grocery store in New Orleans to report their location.

14. From Venice, the CAPTAIN COON sailed west to Galveston, Texas, where Parfait attempted to get licenses to shrimp Texas waters. He was advised by the Texas authorities that the vessel's documents were not original copies and, thus, he could not be provided with a proper license. Captain Parfait attempted to contact Clyde Maise at the grocery store in New Orleans but received no response to his request for the original documents.

---

1. It might be appropriate at this juncture to point out that the majority of the factual evidence presented to the Court was elicited from two witnesses at trial—Clyde Maise and Abraham Parfait. The testimony of these two individuals was, for the most part, unreconcilable. Whether due to poor discovery work or circumstances beyond the control of the parties, little or no corroborative testimony was presented on behalf of either cause, effectively reducing the fact finding phase of these proceedings to a swearing match. Despite this, I have drawn factual conclusions where necessary so that the issues before me can be resolved.

15. After leaving Texas waters, the vessel worked its way back to Cameron, Louisiana, in late July 1982. Upon arrival in Cameron, Parfait again telephoned Clyde Maise in New Orleans to request badly needed equipment for the CAPTAIN COON. Approximately thirty minutes later, Captain Parfait was paged over the public address system at the dock and told that "his boss was on the telephone". When Parfait answered the phone, the caller identified himself as Harlan Dawson. The captain advised Dawson that the vessel was in urgent need of supplies in order to continue shrimping, and Dawson advised him that he would be arriving in Cameron that afternoon to help supply the vessel.

16. Harlan Dawson arrived on the afternoon of July 27, 1982 with his ex-wife and their daughter. Some work was performed on the vessel's generators, stores were replenished and two young men from Texas, Richard Pearson and George Wagner, were signed on as crew. Prior to leaving Cameron, Dawson purchased approximately $7,000.00 of fuel on credit.

17. The CAPTAIN COON left Cameron and shrimped the waters off of Louisiana and Mississippi. Due to failing equipment and poor catches, Harlan Dawson contacted other vessels in the area to sell some of the fuel aboard. In addition, he advised Captain Parfait that they would take the vessel into Pascagoula, Mississippi, for repairs.

18. The vessel made landfall in Pascagoula in Mid-August 1982. The two crew members, Pearson and Wagner, were paid off with a portion of the proceeds from the sale of the fuel and they left the vessel. Dawson traveled to Biloxi where he was to meet with Clyde Maise. Upon his return, he advised Captain Parfait that the vessel was losing money in the shrimping business and that he and Clyde Maise had decided to take the vessel to the Bahamas to be converted to a lobster fishing vessel.

Dawson offered to pay Parfait $200.00 per day to act as master of the vessel on the voyage to the Bahamas and during the lobstering operations in that country.

19. Captain Parfait and Harlan Dawson departed Pascagoula alone and arrived in Key West, Florida, in late August 1982. After some delays in Key West, the CAPTAIN COON sailed for Freeport, Bahamas, and arrived the following day. Parfait "entered" the vessel with the port authorities under her proper name and "signed in" as master. Customs agents boarded the vessel, stamped Parfait's passport and provided him with a temporary visa. Captain Parfait was introduced by Harlan Dawson to two individuals, "B.J." and Frank Holmes, who were to be involved in the "lobstering operation." [2]

20. Parfait spent the next couple of weeks traveling between Freeport and Miami, where he had relatives, while waiting for delays in the lobstering operation to be worked out. In time, however, Parfait exchanged words with Frank Holmes and decided he could no longer work with the Bahamas operation due to this personality conflict. He flew back to Florida where he remained with his brother-in-law until June 1983.

21. In early August 1982, the insurers of the CAPTAIN COON were contacted and advised that the vessel was reported as "missing". SMU retained the services of Land & Marine Services, Inc., specialists in marine casualty investigations, to investigate the loss of the vessel.

22. In early August 1982, a Land & Marine investigator and Clyde Maise drove to Dulac, Louisiana, and Cameron, Louisiana, to develop information regarding the location of the vessel and its crew. Prior to this time, no search had been conducted by Wilfred or Clyde Maise. The only efforts by Wilfred Maise to locate his vessel was to telephone the United States Coast Guard on one occasion. No written report

---

**2.** This Court's factual reference to these representations is only that. The finding that such representations were made is not, of course, an indication of my conclusions regarding the truthfulness or veracity thereof. Lobstering in the Bahamas was, I believe, highly unlikely, but the actual intended use of the vessel in those waters is not an issue before the Court.

of the loss was ever submitted by the Maises to the Coast Guard or the Cameron Parish Sheriff's Office.

23. As a result of an ongoing investigation by the insurers, Captain Parfait was located in Florida and, based upon information he supplied to investigators, the vessel was located and recovered in Freeport, Bahamas, on February 4, 1983. The vessel was sitting at a dock in Freeport Harbor where she had remained since her arrival.

24. The vessel was tendered to Wilfred Maise on February 10, 1983, but its owners refused to accept the tender and the financial burden of returning it to Louisiana. The CAPTAIN COON was eventually returned to these waters at the expense of SLPCA, the holder of the preferred ship mortgage on the vessel.

25. Wilfred Maise and Gulf Ventures III have filed suit against Glacier General for the loss of the vessel due to acts of barratry by Captain Parfait. SLPCA alleges a cause of action against the insurer under the policy's "sue and labor" clause for approximately $31,000.00 which was expended in the recovery of the M/V CAPTAIN COON.

### Conclusions of Law

1. The Court has jurisdiction over this dispute pursuant to 28 U.S.C. Section 1333 and 28 U.S.C. Section 1332.

2. The nature of plaintiffs' cause of action is for breach of contract with regard to a hull and machinery policy of insurance issued by Glacier General to Gulf Ventures III as owner of the M/V CAPTAIN COON and to SLPCA as loss-payee under the policy.

3. Under a specific perils insurance policy the burden of proving a loss by a peril insured against is on the insured. *Darien Bank v. Travelers Indem. Co.,* 654 F.2d 1015 (5th Cir.1981); *S. Felicione & Sons Fish Co. v. Citizens Casualty Co. of N.Y.,* 430 F.2d 136, 138 (5th Cir.1970) *cert. denied,* 401 U.S. 939, 91 S.Ct. 936, 28 L.Ed.2d 219 (1971).

4. The evidence introduced at trial centered upon the question of whether the loss of, or damage to, the M/V CAPTAIN COON was the result of a named peril covered by the policy—specifically barratry of the captain and crew. Barratry of the master is defined "as an act committed by the master or mariners of a ship for some unlawful or fraudulent purpose, contrary to their duty to the owners, whereby the latter sustain an injury." *Fishing Fleet, Inc. v. Trident Ins. Co., Ltd.,* 598 F.2d 925, 927 (5th Cir.1979) (quoting *Marcardier v. Chesapeake Ins. Co.,* 12 U.S. (8 Cranch) 39, 49, 3 L.Ed. 48 (1814)). In the absence of fraud, nothing but acts of known criminality, gross malversation, or the like can amount to barratry. *Commercial Trading Co., Inc. v. Hartford Fire & Insurance Co.,* 466 F.2d 1239 (5th Cir. 1972); *National Union Fire Insurance Co. v. Republic of China,* 254 F.2d 177 (4th Cir.1958) *cert. denied* 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958). A claimed loss arising from the mere negligence of a captain or crew, incompetence of the captain, or for mistake by the captain as to the meaning of his instructions can never amount to "criminal barratry." *Commercial Trading Co. v. Hartford Fire Insurance Co., supra; Fishing Fleet, Inc. v. Trident Insurance Co., Ltd., supra; Intermondale Trading Co. v. North River Insurance Co.,* 100 F.Supp. 128 (S.D.N.Y. 1951).

5. Applying this law to the facts presently before the Court, it is clear that in order for plaintiffs to recover for damages resulting from barratry, they must prove that Captain Parfait illegally or fraudulently misappropriated the shrimping vessel, the M/V CAPTAIN COON, in violation of his duty to the owners and to their detriment. I am not convinced that the plaintiffs have carried this burden. It must be emphasized that it is not enough to show that Parfait was mistaken in his belief that Harlan Dawson had the authority to direct the operations of the vessel or to convince the Court that Parfait was not as naive as he would lead the Court to believe. The factual circumstances surrounding the

"disappearance" of the CAPTAIN COON from the Gulf are suspicious enough indeed. But suspicion, let alone pure speculation, is not an acceptable substitute for proof by a preponderance of the evidence.

6. Having failed to prove that the damage to the vessel resulted from an insured peril—namely barratry, the Court need not consider plaintiff SLPCA's claim for expenses in returning the vessel from the Bahamas to Louisiana under the "sue and labor" clause of the policy. The assured is entitled to recover "sue and labor" charges only if such charges are incurred as the result of a covered peril and only if incurred to save the property from further loss. Accordingly, SLPCA's claim for expenses must be denied. See *Reliance Insurance Co. v. The Escapade*, 280 F.2d 482 (5th Cir.1960); *Home Insurance Co. v. Ciconett*, 179 F.2d 892 (6th Cir.1950).

Finally, plaintiffs have alleged damages for loss of certain electronic equipment apparently stolen from the M/V CAPTAIN COON. Once again, however, the Court's hands are tied in that no evidence, except for testimony relating to the replacement cost of the equipment, was presented at trial. The Court finds that the plaintiffs have failed to prove by a preponderance of the evidence (a) that the loss of the electronic equipment occurred as a result of a named peril under the policy, (b) that the loss of the electronic equipment occurred as one loss subject to only one deductible, or (c) that the loss of the electronic equipment occurred during the term of the policy. Accordingly, no recovery can be had for the loss of such equipment.

In accordance with these findings, defendant is entitled to judgment in its favor and against plaintiffs, dismissing their claims.