LEXINGTON INSURANCE
CO., Plaintiff,

v.

COOKE'S SEAFOOD, Snooper Fleet, Inc., and Borg–Warner Corp., Defendants.

No. CV486–064.

United States District Court, S.D. Georgia, Savannah Division.

Jan. 7, 1987.

Robert S. Glenn, Jr., Savannah, for plaintiff.

Walter C. Hartridge, Barnard M. Portman, Savannah, Ga., for defendants.

## ORDER

EDENFIELD, District Judge.

This declaratory judgment action was tried before the Court in admiralty on December 16, 1986. Having heard the testimony and arguments of counsel, and having reviewed the relevant documentary evidence, the Court makes the following findings of fact and conclusions of law. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

## FINDINGS OF FACT

Plaintiff Lexington Insurance Company [Lexington] is a Delaware corporation; its principal place of business is in Boston, Massachusetts. Defendant Snooper Fleet, Inc. [Snooper Fleet] is a South Carolina corporation; its principal place of business is in Murrel's Inlet, South Carolina. Snooper Fleet engages in the commercial fishing business and currently is the owner of several fishing vessels. Defendant Borg–Warner Corporation [Borg–Warner] is a Delaware corporation engaged, *inter alia*, in the provision of financing for various kinds of commercial ventures.

In connection with the purchase of the F/V C–Jack, a 46–foot fiberglass hulled fishing vessel, Snooper Fleet obtained financing from Borg–Warner, the latter retaining a preferred ship's mortgage on the ship. In February, 1981, Lexington, through an agent in Brunswick, Georgia, issued a marine insurance policy to "Cooke Seafood d/b/a Snooper Fleet, Inc.," naming both Snooper Fleet and Borg–Warner as loss payees. Lexington's policy provided coverage for physical damage and loss to three small vessels listed in the policy, these including the F/V C–Jack.

At issue in the case at bar is the alleged breach by Snooper Fleet of the navigation warranty contained in the aforementioned policy. Express "navigation" or "trading" warranties, setting out limitations on the geographic areas in which covered vessels may operate, are commonly included in maritime insurance policies. The terms of such warranties are determined on a policy by policy basis with reference to the physical characteristics of the insured vessel or vessels, including hull strength, seaworthiness, and the type and quality of safety and communications equipment carried. The policy issued to Snooper Fleet by Lexington contained the following language: "NAVIGATION WARRANTY: confined to the inland and coastal waters of the United States from Cape Hatteras, North Carolina to Brownsville, Texas not exceeding 100 miles offshore, excluding all territorial waters of Cuba or Mexico." The policy also provided: "Any deviation beyond the navigation limits provided herein shall void this policy; but on the return of the vessel in a seaworthy condition, within the limits herein provided, this policy shall reattach and continue in force and effect...." It is the plaintiff's contention that, when the C–Jack was sunk by a hurricane on October 27,

1985, the vessel was outside of the designated 100 mile limit, and that therefore the loss of the C–Jack is not covered under the policy.

In October, 1985, the C–Jack, captained by Mr. John Hogan, a fisherman with approximately twenty years of experience, prepared to set out from the port of Galveston. The vessel, the smallest that Mr. Hogan had ever captained, was equipped for "bottom long-lining," i.e., it carried several miles of steel cable, to be equipped with tackle as it was played out. On Thursday, October 24, 1985, Captain Hogan listened to a weather report from the National Oceanographic and Atmospheric Administration [NOAA]. The report indicated that for the next three days winds could be expected to be between ten and fifteen knots, out of the southeast, and that there was no chance of a tropical storm. According to Captain Hogan, this report foretold "perfect fishing weather." Hogan Deposition at 8.[1] Thus, at about noon on that day the C–Jack departed Galveston.

The C–Jack was equipped with a General Motors 671 diesel engine, capable of generating close to 1700 RPMs. Captain Hogan testified that, in order to conserve fuel and to avoid wear and tear, he never ran the engine over 1400 RPMs. It can be estimated that the C–Jack proceeded from Galveston at a speed of approximately six to seven knots, the engine operating at 1400 RPMs. See Hogan Deposition at 38. The ship proceeded throughout the daytime on the 24th and on into the night. At about 3:00 A.M. on October 25, Captain Hogan was awakened from his sleep by the noticeable loss of power in the vessel's diesel engine. According to Mr. Hogan, the RPMs had dropped to 700. This occurrence, the result of sediment in the fuel having clogged several fuel filters, reduced the maximum speed of the vessel to two to three knots.

There is much confusion concerning the exact location of the C–Jack at the time of the engine difficulties under discussion, and from the utterly inconsistent and in many ways patently incredible testimony of the captain, the Court is unable to determine the location with any degree of accuracy.[2] In any event, the captain was not much concerned by the problem, as the following excerpt from his deposition indicates:

[EXAMINATION BY MR. YELLIN (Plaintiff's counsel)]

Q. ... At the moment you first encountered any problems, why didn't you return to Galveston?

A. It wasn't a life threatening situation, to begin with. There was no threat of a storm. I did have some replacement filters. So, in a situation like that when you're at sea, you affect [sic] your repairs and continue on with your work. You can't be turning around and running to the dock every time you run into a little problem.

*Hogan Deposition* at 16–17.

Captain Hogan proceeded to replace several fuel filters with spares he kept on board; this replacement did not restore full power to the vessel. Nevertheless, believing that the situation was in no way serious, Captain Hogan did not attempt to contact the Coast Guard. *Id.* at 26. Rather, he "proceeded" offshore to an oil rig with which he was familiar, the Zapata Neptune # 39. At reduced speed, it took the vessel somewhere between no time at all and nine hours to reach the oil rig.[3] Mr. Hogan did

---

1. Captain Hogan, a fisherman who spends the better part of each month during the fishing season at sea, was unavailable to testify at trial. His deposition was introduced in evidence in its entirety by defense counsel. Plaintiff introduced the transcript of a previously recorded telephone interview of the captain, taken by an insurance agent shortly after the sinking of the C–Jack, in order to point out several significant prior inconsistent statements.

2. *See infra* note 3.

3. On at least one occasion, the captain estimated the distance from shore at the time engine difficulties developed as between 50 and 60 miles. *Deposition* at 16. Later, the captain estimated 70 miles. *Deposition* at 23. Yet the captain stated that it took him four or five hours to reach the platform at reduced speed from the point at which he had engine problems, *Deposition* at 39, which, assuming a speed of two to three knots, would suggest that the C–Jack was already at least 85–90 miles from shore at the time the engine difficulties arose. (Of course,

contact an oil rig supply vessel, which informed him that it was heading in, and that it would procure additional fuel filters in Cameron, Louisiana, with which it would return the following day. While it is nowhere stated in the captain's deposition, the only logical conclusion that the Court can reach, regardless of the location of the C–Jack at the time engine problems developed, is that this supply vessel was to rendezvous with the C–Jack at the aforementioned oil rig on Saturday, October 26. The Zapata Neptune platform # 39 is located more than 100 miles from shore.[4]

It is appropriate at this juncture to discuss the captain's understanding concerning the vessel's navigation warranty. The captain at all times has maintained that, while he may have been aware that there was some limitation upon the area in which he could fish, he was not aware that the insurance policy at issue contained a 100 mile navigation warranty. Similarly, according to the captain, at no time prior to the vessel's ill-fated voyage did the *owner* make it clear that the vessel should remain within 100 miles of shore. Deposition at 30–31, 35; Interview at 4. In fact, according to the insurance agent who interviewed Mr. Hogan, the captain stated to this agent that he would not have agreed to sail with the C–Jack, had he known of the 100 mile

limitation, because the fish that the captain sought lived in deeper water than could be found within 100 miles of shore. Tr. at ——.[5] Notwithstanding the owner's testimony at trial that he had explained the terms of the policy to the captain, the Court did not find this testimony entirely credible. The record supports the Court's findings that the owner did not specifically inform the captain of the 100 mile trading limit and that at no time did the captain consider the trading limit as a factor in determining whether to proceed to the oil rig.

In any event, whether at 3:00 A.M. on Friday the 25th, at noon, or at some time between, the C–Jack tied up to a mooring buoy close by the Zapata oil rig and outside the 100 mile navigational limit of the policy. There, the captain continued work upon the engine's fuel system, content to wait for the return of the supply vessel that had promised replacement filters. Late that night, the seas began to rise, though, as the captain pointed out, as of Friday night "it wasn't real bad." Deposition at 49. Only on Saturday did it become "rough," in the captain's opinion. *Id.* at 25. At some time on Saturday, Mr. Hogan was informed by a supply ship moored by the oil rig (a different supply ship from the one that was

the captain also testified at one point that he arrived at the rig "before noon," indicating at this point in his deposition that perhaps it took longer than three or four hours to get to the rig. *Deposition* at 48). More curious still, in the aforementioned interview with an insurance agent, *see supra* note 1, Mr. Hogan stated:

> [W]e steamed, we got to, uh, where I intended to tie up [clearly referring to the oil rig] to, get the gear ready to fish. We steamed on over there, got there about three o'clock in the morning. That's when, uh, I was sleeping when we got there, but what woke me up was the sound of the engine. We lost all of the power completely, we dropped down to about 500 rpm. *Hogan interview* at 11.

This comment would indicate that the C–Jack was at or very close to the oil rig when the engine problems arose. That the C–Jack was close to the Zapata Neptune # 39 rig at 3:00 A.M. seems not unlikely: Assuming a speed of seven knots from noon Thursday until 3:00 A.M. Friday, the C–Jack could have travelled approximately 105 nautical miles from Galveston. The end result of all of this conflicting data is that the captain's testimony with respect to the loca-

tion of the vessel must be viewed with extreme skepticism. As will be indicated, *infra,* however, the location of the vessel at the time the engine difficulties arose is not crucial to the Court's holding.

4. There was some argument at trial concerning the exact location of the oil rig itself, and as to whether navigation warranties in marine insurance policies set geographical limits in terms of nautical mile or statute miles. The Court need not address these questions, for it is not denied that the oil rig was at least 101 nautical miles from shore, the distance conceded by the defense. According to a witness for the plaintiff, the rig was 117 statute miles from shore.

5. The insurance agent, Mr. Woodruff, who testified at trial for the plaintiff, claims that Mr. Hogan stated that he had hoped to catch "pile" fish in deep water outside of the 100 mile limit. This statement conflicts with the captain's later deposition testimony to the effect that he intended to fish the West Flower Garden Bank (within the 100 mile limit) for grouper and snapper.

to have brought replacement filters—the first ship was unable to return from Cameron because of worsening weather conditions) that a tropical depression which had formed to the south had been "upgraded" to hurricane status by the weather bureau (Hurricane Juan), and had begun to move in the direction of the C–Jack.

A detailed description of the events that followed is unnecessary. Suffice it to say that the hurricane bore down upon the oil rig with such speed that there was insufficient time even to evacuate, as is customary, the oil rig's crewmen. Thus, the crews of the rig, the supply ship, and the C–Jack were forced to ride out the storm on their respective "vessels." The C–Jack was very badly damaged during the hurricane, which brought with it seas of 18–20 feet. Consequently, on Sunday morning, October 27, 1985, in heavy seas, the four persons aboard the C–Jack abandoned ship and were fortunate enough to be pulled from the water by the crew of the supply vessel. Almost immediately after this evacuation, the C–Jack broke loose from the last of the lines that had secured it to the supply ship, drifted into the distance, and, presumably, sank.

## CONCLUSIONS OF LAW

This is an action in admiralty for declaratory relief under a marine insurance policy. The dispute is properly before the Court. 28 U.S.C. § 2201; Fed.R.Civ.P. 9(h).

■ It is well established that where a vessel ventures voluntarily outside of the navigational limits specified in a hull policy, and sinks or is otherwise destroyed while outside the mentioned limits, the insurer is relieved from liability for the loss of the vessel. *United States Fire Ins. Co. v. Cavanaugh*, 732 F.2d 832 (11th Cir.1984), *cert. denied* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402; *Robinson v. Home Ins. Co.*, 73 F.2d 3 (5th Cir.1934); *Canton Ins. Office v. Indep. Transp. Co.*, 217 F. 213 (9th Cir.1914); *R & W Boat Rentals v. Pennsylvania Ins. Co.*, 1972 A.M.C. 1783 (Ct.App.La.1972); *Vizzini v. Ins. Co. of North America*, 260 Md. 626, 273 A.2d 137 (1971); *Rosenberg v. Maritime Ins. Co.*,

1968 A.M.C. 1609, 212 So.2d 45 (Ct.App.Fla. 1968); *Rosenbauer v. Standard Ins. Co.*, 1949 A.M.C. 716 (Cir.Ct.Fla.1949). It is undisputed that the vessel in the case at bar, the C–Jack, was outside of the 100 mile navigational limit imposed by the marine insurance policy issued by plaintiff Lexington. Nevertheless, the defendants advance several arguments in support of their position that the loss of the C–Jack is covered under this policy. The Court finds none of these arguments convincing.

First, the defendants maintain that there is no established maritime law governing the precise issue here involved, and that therefore the Supreme Court's decision in *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) mandates that the case be determined on the basis of state law. According to the defendants, the law of Georgia demands that a loss be causally related to a breach of warranty before coverage may be avoided, and that, because the C–Jack was sunk as the result of a peril (hurricane) covered by the policy, the technical breach of the express navigation warranty does not defeat coverage.

*Wilburn Boat* did indeed indicate that state law may be looked to under appropriate circumstances where no established federal maritime law clearly controls. That case also did involve a situation that might be considered analogous to the case at bar. In *Wilburn Boat*, the "vessel" owners purchased a houseboat to use for commercial carriage of passengers on an artificial inland lake on the border of Texas and Oklahoma. The insurance policy obtained for the houseboat included a warranty that the "vessel" be used only for private pleasure purposes. The houseboat was destroyed by fire, and the insurance company sought to avoid liability because of the breach of the mentioned warranty. The Supreme Court found that there was no settled admiralty rule demanding "literal performance" of express warranties in maritime insurance policies. (The issue had not often been before the courts, nor has it been in the years since *Wilburn Boat* was decided). The Court therefore

looked to Texas law for guidance, and determined that, because the loss was not causally related to the breach of the express warranty, coverage could not be avoided. *Wilburn Boat* has been severely criticized by the commentators, one respected source referring to the implications of the case as "nightmarish." [6]

*Wilburn Boat*, fortunately, does not bind this Court with respect to the facts of the case at bar. Navigation warranties are peculiarly maritime in nature, unlike the warranty at issue in *Wilburn Boat*. And not only is the uniformity so essential to a coherent body of admiralty law advanced by maintaining a federal rule concerning the effect of a breach of a trading limit warranty, *see generally Offshore Logistics v. Tallentire*, 477 U.S. 207, 106 S.Ct. 2485, 91 L.Ed.2d 174 (1986) (state wrongful death remedies do not apply on the high seas),[7] but federal maritime decisional law concerning the necessity of strict adherence to the terms of *this type of express warranty* was clearly established prior to the *Wilburn Boat* decision. *Robinson v. Home Ins. Co.*, 73 F.2d 3, *supra; Canton Ins. Office v. Indep. Transp. Co.*, 217 F. 213, *supra.*

■ Additionally, *Wilburn Boat* is not helpful to the defendants in this case because *Georgia law* does not presume to control the issue.[8] *See* O.C.G.A. § 33–24–2 (specifically excluding "[o]cean marine and foreign trade insurances" from regulation under chapter 24 of the Georgia Code). As the Georgia Court of Appeals has noted: "[T]here is very little Georgia law on marine insurance[;] general maritime law governs the construction of these policies and there are many useful cases from the federal courts and other states." *Mathis v. Hanover Ins. Co.*, 127 Ga.App. 89, 90, 192 S.E.2d 510 (1972). *See also Tugalo Devel. Co. v. Ins. Co. of North America*, 132 Ga.App. 495, 208 S.E.2d 502 (1974) (court referring to general maritime law in determining that loss caused to ship while in transit on land not covered under specific terms of marine insurance policy). Looking to the state and federal cases cited, *supra*, for the proposition that exceeding a navigational limitation defeats coverage under a marine insurance policy, *see especially R & W Boat Rentals v. Pennsylvania Ins. Co.*, 1972 A.M.C. 1783; *Rosenberg v. Maritime Ins. Co.*, 1968 A.M.C. 1609, 212 So.2d 45, it appears clear that there is a sufficient body of "general maritime law" to which the Georgia courts would defer, and it seems highly unlikely that the Georgia courts would invoke the "causal relationship to the loss" rule applicable with respect to the breach of certain terms of insurance policies under state law. *See*

---

**6.** The decision in *Wilburn* is hard indeed to reconcile with the postulate of there being a federal maritime law at all; it is even harder to square with the assumption that the law of maritime insurance is a part of that law. The opinion of the Court poses as its first question "Is there a judicially established federal admiralty rule governing these warranties?" This seems to suggest the possibility that those questions of law concerning which litigation in the federal courts has been active enough to satisfy the Court's criteria of "establishment" are to be considered as ruled by maritime admiralty law, while those which for any reason (in this relatively non-litigious field) happen not to have reached the federal courts in volume are to be relegated to the legislative competency of the States. This is, with deference, a nightmarish solution; yet, if it is not the one envisaged, why pose the question in that way?

Gilmore & Black, *The Law of Admiralty* 69 (2d Ed.1973) (footnote omitted).

**7.** Justice Frankfurter, concurring in *Wilburn Boat*, expressed the opinion that the case should

not be read broadly and questioned the appropriateness of applying the perhaps unnecessarily broad holding of the case to truly maritime matters or to controversies arising on the oceans. 348 U.S. 322–24, 75 S.Ct. 375–76. In this case, it would pose a significant problem, for example, to determine whether the law of Massachusetts, Delaware, South Carolina, Georgia, or Texas might control if state law were to be consulted. *But see infra*, note 7. Bearing in mind that ships, fishing vessels in particular, often operate in the waters of several or many states, to allow for different standards of coverage where trading limit warranties have been breached according to where a vessel sank, or where the insurance policy providing coverage was issued, etc., would have a severely deleterious effect on uniformity in maritime law.

**8.** It appears that *Wilburn Boat* suggests reference, where appropriate, to the law of the state in which the contract of insurance was formed. 348 U.S. 311–12, 75 S.Ct. 369–70.

*generally Liberty Nat. Ins. Co. v. Morris,* 132 Ga.App. 631, 208 S.E.2d 637 (1974). And there being no conflict between Georgia law and the *federal* cases that have addressed the issue at hand, a *Wilburn Boat* comparative analysis of competing state and federal interests, *see Steelmet, Inc. v. Caribe Towing Corp.,* 779 F.2d 1485, 1488 (11th Cir.1986), is unnecessary. Thus, this Court finds first that navigational warranties are to be strictly construed in accordance with judicially established federal maritime law, and finds second that even if state law were in some way relevant to this dispute, Georgia law would not dictate a result contrary to that reached in this Order.

■ Yet, the defendants contend, even assuming that case law generally supports the plaintiff's position, the instant case is distinguishable from cases in which coverage has been avoided because here it was the captain, rather than the insured, who decided to venture outside of the 100 mile navigational limit. Pointing to the case of *United States Fire Ins. Co. v. Cavanaugh,* 732 F.2d 832, *supra,* the defendants claim that coverage for the loss is required unless the navigational limitation was exceeded through "a voluntary act of the insured." *Id.* at 834. There are two flaws in this argument. First, the facts of the *Cavanaugh* case are inapposite to those of the case at bar. Resolution of the dispute in that case necessitated a determination whether the vessel had been taken outside of navigational limits as a result of "barratry" on the part of the master.[9] Barratry was a covered peril under the policy considered in *Cavanaugh,* just as it was under the policy covering the C–Jack. In this case, however, barratry is not an issue.

The quoted language of the *Cavanaugh* case refers to the standard for determining whether there has been barratrous conduct; it does *not* imply that, if a master, without the actual knowledge of the owner, accidentally or purposefully ventures outside of navigational limits in pursuance of the vessel owner's business, coverage is somehow extended beyond the limits of the navigation warranty (absent, of course, a showing of barratry). But the more significant flaw in defendants' argument is that, even if the *Cavanaugh* case were to be read as they contend it should be, the Court has already determined that the owner's instructions to the master were deficient with respect to the navigational limitations of the policy. Having failed to outline clearly the nature of the limitations to the master, the owner cannot now successfully argue that coverage is required because the master's acts were "unauthorized."

■ Defendants also suggest that, should the Court determine that Captain Hogan's decision to proceed to the oil rig was negligent, coverage might be appropriate under the Inchmaree clause of the policy, covering "negligence of masters, mariners, engineers or pilots; provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them."[10] The Court does not find that the captain's acts were negligent,[11] and as indicated, *supra,* if there was any want of due diligence here involved, it was that of the owner in failing clearly to explain the nature of the navigational limits to the captain.

The defendants argue, finally, that a ruling in favor of the plaintiff would not serve

9. Barratry can be defined as (1) an act committed by the master or mariners of a ship involving a deliberate and willful disobeyance of the owner's instructions, (2) an act committed by the master or mariners of a ship for some unlawful, dishonest, or fraudulent purpose, contrary to their duty to the owners, whereby the latter sustained an injury, or (3) every violation of duty by the master or mariners arising from gross and culpable negligence contrary to their duty to the owner. *Cavanaugh, supra,* 732 F.2d at 835. "A claimed loss arising from the mere negligence of a captain or crew, incompetence of the captain, or

for mistake by the captain as to the meaning of his instructions can never amount to 'criminal barratry.'" *Gulf Ventures III, Inc. v. Glacier Gen. Assurance Co.,* 584 F.Supp. 882, 886 (E.D. La.1984).

10. For cases discussing the application of Inchmaree clauses, *see Union Oil Co. of Calif. v. M/V Point Dover,* 756 F.2d 1223 (5th Cir.1985); *Ferrante v. Detroit Fire and Marine Ins. Co.,* 125 F.Supp. 621 (S.D.Cal.1954).

11. *See infra* note 12.

public policy. Specifically, the defendants question the propriety of creating precedent that would have the effect of forcing a master to scurry within navigational limits in the face of an impending storm, notwithstanding the existence of a safer mooring just outside of the vessel's trading limit. Such an argument distorts the facts of the case at bar, and overlooks public policy concerns well served by the Court's decision.

As to the facts, Captain Hogan's decision to proceed to the oil rig was not motivated by fear of Hurricane Juan but rather was influenced by his desire to effect repairs and to not be delayed in the performance of his, and the vessel owner's, business by the occurrence of a "little problem." [12] The vessel was where it should not have been long before a storm developed; had it stayed within its trading limits, it might well still be afloat today.[13] As to policy, it would not be proper to encourage masters to effect repairs outside of trading limits or vessel owners to be lax in their instructions to masters concerning navigation warranties. Such warranties, where they are relatively restrictive, are intended *inter alia*, to ensure that when "little problems" arise on "little vessels," the masters of such ships will think seriously of and have adequate opportunity for heading to port or

seeking refuge in waters close to shore, where the weather is presumptively less violent than on the high seas. The owner in this case failed to communicate adequately the nature of the vessel's trading limits to the master, and must in any event be held to bear the risk of loss in accordance with the express terms of the navigation warranty.

The Clerk is directed to enter judgment for the plaintiff.

---

**12.** Perhaps in commanding the larger fishing vessels (with less restrictive trading limits) to which Captain Hogan was accustomed, his decision would have been entirely appropriate. And, inasmuch as he was not aware of the precise trading limits of the C–Jack, the captain cannot be said to have failed to exercise good judgment in venturing to the rig. (It must be conceded that under the circumstances of the case at bar, his decision to *remain* at the oil rig after having heard of the approaching storm was in all respects prudent).

Even if the captain *had* been aware of the terms of the navigation warranty, it would not necessarily have been "negligent" to take a calculated risk to moor outside of the ship's trading limits, in reliance on the unlikelihood of a major storm. If it were the rule that every time a master exceeds a vessel's trading limits his acts must be considered either barratrous or negligent, such that coverage under either a perils or an Inchmaree clause would be afforded for any loss occurring beyond these geographical limits, there would be little incentive for owners to ensure that the terms of navigation warranties are complied with by their em-

ployees. There would also be few instances (cases such as the one at bar would present the only exception) involving commercial vessels on which the owners are not present, where a trading warranty would have any effect at all.

**13.** The captain testified that to proceed directly to Galveston, at half power, through the maze of manned and unmanned oil rigs that lay in the direct path back to port, would not have been advisable. Nevertheless, feasible alternatives, had the captain been aware of the vessel's trading limits, such as contacting the Coast Guard for immediate assistance or finding a temporary mooring at a manned rig closer to shore, were available. Additionally, referring to the charts, it appears that the C–Jack was not far from a "safety fairway," offering a clear channel directly to Galveston. The C–Jack could certainly have reached port or have been close thereto within twenty-four hours by following this route. Whether the C–Jack was fifty, seventy, or ninety miles from shore—or even at the oil rig itself—at the time difficulties were encountered, these options could have been considered.