Millard V. IRWIN, owner of the YACHT "JOMIE", Plaintiff-Appellee,

v.

EAGLE STAR INSURANCE COMPANY, Ltd., Defendant-Appellant.

No. 71-2348.

United States Court of Appeals, Fifth Circuit.

Feb. 29, 1972.

Rehearing Denied April 13, 1972.

Gerald M. Walsh, James V. Dolan, Ft. Lauderdale, Fla., for defendant-appellant.

G. E. Hartwig, Fort Lauderdale, Fla., for plaintiff-appellee.

Before WISDOM, COLEMAN and SIMPSON, Circuit Judges.

COLEMAN, Circuit Judge:

Did the marine insurance policy issued by Eagle Star Insurance Company, Ltd., cover the loss of the yacht "Jomie"? Upon a complaint filed in admiralty the District Court held for the insured. We reverse.

The circumstances of the loss are not disputed.

One afternoon the "Jomie" was tied up at the dock, with no premonition of impending disaster. During the night, while unoccupied, the yacht sank. A one inch iron nipple in the piping of the air conditioning system broke within approximately six months of its installation by an independent air conditioning firm. The iron nipple was joined to two brass fittings. It was usually submerged in the bilge water and was located directly beneath a hatch cover which was left open and observed by the owner as often as once a week when making inspections of the vessel. The fittings had been painted black and, in the absence of scraping, the type of metal of which the nipple was made would not be discerned in the course of a customary inspection.

The expert witnesses on both sides agreed that the sinking of the vessel was caused by the separation of the elbow pipe from the sea strainer in the water intake of the air conditioning system, allowing water to fill the vessel. The separation was caused by an electrolysis which, in turn, had been caused by *the union of steel with brass in the presence of air and salt water.*

The District Court specifically found as follows:

"(1). That the use of the steel elbow in the installation of this air conditioning system created a defect in the machinery of the vessel and that this defect was a latent defect within that definition included in the Latent Defect, Negligence, Risk On Shore, et cetera, clause of the policy;

"(2). It [steel to brass] is not a standard acceptable type of material to use in this elbow;

"(3). The insured was not aware of this condition, this latent defect, until after the loss had been sustained, until after the part had separated and until after the boat had sunk;

"(4). The plaintiff not only did not know and was not aware of the different materials but had no reason to be aware of them, and acting as a reasonable person should not have been aware of them, since apparently the installer did paint the steel elbow when all of these parts were installed;

"(5). There is no conflict but what new parts were used when it was installed and that a reasonable person inspecting this area after such installation, in the words of even Captain Holland, who was an expert, could not have told from such an inspection or it would have been very, very difficult to determine whether that elbow was, in fact, steel or brass;

"(6). The insured would have no reason to suspect this defect, and I find it a very definite defect;

"(7). That this is corroborated by the fact that apparently it only took from early 1969 to September, 1969, for this accelerated wear and tear to cause this separation and to, in fact, cause this loss."

The insurance policy by its Inchmaree clause covered "any latent defect in the machinery or hull".

The decisive issue on appeal is whether the condition hereinabove described was a latent defect within the terms of the policy. Eagle Star says that it was not and declined to pay the loss. This suit followed.

A hundred years ago, the Supreme Court, in a thoroughly exhaustive opinion authored by Mr. Justice Bradley, held that a contract of marine insurance is a maritime contract, within the admi-

ralty and maritime jurisdiction, though not within the exclusive jurisdiction of the United States Courts, Insurance Company v. Dunham, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870). In Kossick v. United Fruit Company,[1] the Supreme Court repeated that a contract to insure a ship is maritime. That, however, does not determine whether the interpretation and application of the policy terms are to be governed by state or maritime law.

Wilburn Boat Company v. Fireman's Fund Insurance Company[2] was commenced in a Texas state court by the insured against an insurer for fire loss to a vessel covered by a full marine risk insurance policy. The case was removed to the United States District Court for the Eastern District of Texas on diversity grounds. At the time of the loss the boat was located on Lake Texoma, a small artificial inland lake between Texas and Oklahoma. The district court found for the insurer. This Court upon appeal, 201 F.2d 833 (1953) affirmed on the theory that the insured had breached the policy warranty as to private use and was therefore barred from recovery under general maritime law, from which maritime policies are derived. We held that a cause of action on a marine policy was a cause of action in admiralty, unchanged in substance when asserted in a court of law. The insured argued in the lower courts that a Texas Statute (prohibiting a forfeiture under the circumstances present and thereby rendering the warranty in the policy unenforceable) should govern the lawsuit. That argument was rejected by the district court and by this Court. The Supreme Court granted certiorari and reversed, holding that in the absence of federal legislation or a conflicting rule of law judicially established by the federal courts, the Supreme Court would leave regulation of marine insurance to the states and would apply the Texas statute to a case involving a Texas marine policy.

In the subsequent *Kossick, supra,* decision, the Supreme Court partially retreated from its holding in *Wilburn Boat.* *Kossick* was a diversity action brought on an alleged oral agreement by a shipowner to assume responsibility for all the consequences of improper or inadequate treatment of the plaintiff-seaman at a Public Health Service hospital in consideration for the seaman's foregoing private treatment. The district court dismissed the complaint before trial on the basis of New York's statute of frauds and the Court of Appeals for the Second Circuit affirmed. The Supreme Court granted certiorari and reversed the judgment of the two lower courts. In holding that the alleged oral contract should be governed by the federal decisional maritime law, the Court, writing through Mr. Justice Harlan, noted the following considerations: the claimed oral agreement might well have been made anywhere in the world; it was desirable that the validity of such an agreement be judged by the same law wherever made; application of New York's law would invalidate the contract; and New York's interest in not lending her courts to the accomplishment of fraud was not sufficient to overcome the countervailing factors in the maritime field. Mr. Justice Harlan's opinion addressed itself to the *Wilburn Boat* decision by observing that "the application of state law in that case was justified by the Court on the basis of a lack of any provision of maritime law governing the matter there presented", 365 U.S. at 742, 81 S.Ct. at 894. Finally, Mr. Justice Harlan noted that several commentators had suggested that *Wilburn Boat's* deference to Texas law might be explained by the location of the boat on a small artificial lake between Texas and Oklahoma at the time of the fire.

Despite the language in *Kossick* tending to limit the *Wilburn Boat* opinion to its facts, we believe that *Kossick* did an incomplete job of burying the *Wilburn*

---

1. 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed. 2d 56 (1961).

2. 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).

*Boat* obeisance to state contract law in certain cases involving marine contracts. The *Kossick* opinion emphasized that the alleged oral contract was "essentially maritime" and that such contracts between seamen and shippers could be made "anywhere in the world" involving seamen of many nationalities and many ports of call. In addition, the Supreme Court observed that the alleged oral contract was of no concern to the State of New York except with regard to the solitary interest of protecting its courts from the assertion of fraudulent contractual claims.

▪ After weighing the circumstances of this case in the light of the factors controlling the decision in *Kossick, supra*, we conclude that Florida law should be applied. Unlike the oral contract in *Kossick*, the insurance contract before us in this case is one in which Florida has substantial and legitimate interest. The plaintiff is a Florida resident and the yacht "Jomie" was anchored in Florida waters when she sank. The marine insurance contract was brokered in Florida and the defendant-appellant insurance company is authorized to do business in that state. The plaintiff is no itinerant seaman of the class traditionally protected by the federal maritime jurisprudence.

▪ Having determined that the Florida decisional law should be applied in this case, we believe ourselves bound by the decision of the Fourth District Court of Appeal in the case of Egan v. Washington General Insurance Corporation, 1970, 240 So.2d 875, which presented a factual situation remarkably similar to the one in this case. The yacht "Blue Heaven" sank at the dock because of a defect in its sea strainer assembly, caused by the corrosion of a bolt which should have been of a different type metal. The "Blue Heaven" was covered by the same Inchmaree clause which is present in our case. The Florida court held that since there was no defect in the bolt, as a bolt, but only in the method by which it was used, there was no latent defect and hence no coverage un-

der the policy. Because the Egan case is not meaningfully distinguishable from the one now before us, we conclude that the insurer must prevail.

The judgment of the district court is reversed and the cause is remanded with directions to dismiss the complaint.

Reversed.