ORDER DENYING DEFENDANT GO-THAER’S MOTION TO ALTER OR AMEND ORDER ON DEFENDANT GOTHAER’S MOTIONS FOR SUMMARY JUDGMENT AS TO PLAINTIFFS, ABB POWER (“ABB”) AND OCCIDENTAL INTERNATIONAL (“OCCIDENTAL”) (DE.#576)

ATKINS, Senior District Judge.
THIS MATTER is before the Court on Defendant Gothaer’s above referenced motion, seeking a reconsideration of this Court’s prior Order on Defendant Gothaer’s Motions for Summary Judgment as to Plaintiffs ABB Power (“ABB”) and Occidental International (“Occidental”) (hereinafter Gothaer Order). After careful review of the motion, ABB’s Response and Occidental’s adoption thereof, Gothaer’s reply, applicable law and otherwise being fully briefed on all issues before the Court, it is hereby,
ORDERED AND ADJUDGED:
.(1) Gothaer’s Motion is DENIED. However, for reasons expressed below, the Court finds that some clarification of the Gothaer Order is needed.

FACTS

On August 29, 1988, the Puerto Rico Electric Power Authority (“PREPA”) contracted with Occidental International, Inc. (“Occidental”) for the purchase of an electric transformer. PREPA agreed to pay $1,674,345.50 upon delivery of the transformer to Puerto Rico. As part of that contract, Occidental was required to deliver the transformer to PREPA “FOB Eastern Port of Embarkation.” All sides agree that Talleyrand Terminal, in Jacksonville, Florida, constitutes the point of embarkation eventually settled upon in the contract.
Occidental, for its part, on September 7, 1988, contracted with ABB, as Westinghouse Electric Corp.’s successor,[1] for the eonstrue *1570 tion and purchase of the transformer to be delivered to PREPA. Occidental agreed to pay, and ABB agreed to accept, $1,587,000.00 to manufacture the transformer. The contract provided that ABB was to deliver the transformer “FOB Point of Shipment.” The purchase order further declared that:
Terms Are Net 30 Days with an Assignment of Proceeds to Westinghouse in Order that Payment for our invoice will go from (PREPA) directly to Westinghouse.
According to the unambiguous language of the purchase order, PREPA was to pay ABB for the price of the transformer. Occidental was to receive from ABB the difference in price between the PREPA purchase order, and the Occidental purchase order — the price difference between the two contracts constituting Occidental’s profits for the transaction.
The transformer, ALM 3030, was eventually completed and ready for transport from Muncie, Indiana to Puerto Rico in 1990. ALM 3030 was transported by railcar from Muncie to Jacksonville, Florida in May, 1990. Once at the port in Jacksonville, it was to be lifted from the railcar, placed onto a lowboy and rolled onto a barge for delivery to Puerto Rico. Occidental contracted with Nelson & Associates, who in turn contracted Lane Crane to handle the discharge of ALM 3030 from the railcars.
There is substantial disagreement whether Occidental was acting as carrier for PREPA after delivery of the transformer to Jacksonville, or was merely completing its contract to deliver the transformer onto the barge at port. Regardless of the legal question of who possessed title to the transformer at the time of the accident, there is no disagreement that Occidental, through its various agents, was in charge of moving the transformer from the railcar to the barge.[2]
As part of its overall responsibility to deliver the transformer Occidental obtained, through its agent S & L Transportation Co., marine insurance to cover the transformer during transport. The insurance was obtained with the aid of John Sexton & Associates (“Sexton”), an insurance broker located in New York City. Sexton, in turn, contacted a European broker, Henrijean, to aid in the procurement of a quote from the European insurance market. Henrijean, for its part, worked closely with Carl Schroter GmbH (“Schroter”), underwriting manager for Gothaer, and others, in order to obtain the requested coverage. Sexton originally prepared the Cover Note,[3] a document intended to define the scope of coverage, in late April 1990. The final form of the Cover Note was not issued until May 4, 1990, after review and approval by Schroter, and the insurance was bound on that date.
The Cover Note in its final form is best characterized as an all-risk marine cargo insurance policy, written for “S & L transportation &/or other parties as may be re-quired_ with risk attaching upon discharge from rail cars at port and ceasing on safe delivery to local utility at destination.” The quoted language differs from an earlier draft in which risk attached upon arrival at the pier. Frischen Depo. at p. 138, lines 24-25.
*1571 On May 18, 1990, cranes were hooked to the transformer and it was lifted from the railcar, the railcar was then wheeled out from underneath leaving the transformer suspended in midair. Before the lowboy could be brought under, one of the padeyes to which the cranes were attached gave way and the transformer fell to the ground. One crane was substantially damaged, and ALM 3030 was destroyed. In a lawsuit separate to this (but previously consolidated), Case No. 93-1144, Lane Crane sued ABB and Occidental for the damage to its crane. ABB and Occidental counterclaimed for the damage to the transformer. Since ABB had not yet been paid for manufacturing the transformer, it sued for the value of the transformer, while Occidental sued only for consequential damages. The main issue in 93-1144, was who of the three principals — Lane Crane, Occidental or ABB — was responsible for the attachment of the cranes to the wrong lifting points on the transformer.
This court severed case number 93-1144 for trial in an order dated October 8, 1993 (D.E. # 373 in case number 91-1432). Case number 93-1144 was tried before a jury during the week of December 13, 1993. On December 17, 1993 the jury returned a special verdict[4] finding all parties negligent in causing damage to the crane and to the transformer. The jury found Occidental 80% liable, ABB 15% liable and Lane Crane 5% liable. The jury found that the total amount of damages to the crane suffered by Lane Crane was $47,905.47. The total amount of damages to the transformer suffered by ABB was assessed at $1,494,000.00. Finally, the damages suffered by Occidental as a result of the damage to the transformer was valued at $98,309.59. The Court entered Final Judgment, based on joint submission by the parties, on January 20, 1994. The final judgment apportioned the damages based on the allocation of fault on the verdict form, in accordance with Florida Statute § 768.81.
The current controversy, Case no. 91-1432, involves attempts by ABB and Occidental to recover any loss from their insurers, nominally referred to as Gothaer in this litigation. It is undisputed that Gothaer agreed to bind insurance to cover the transformer. It is further undisputed that the transformer was destroyed by the accident on May 18, 1991, resulting in economic loss to both ABB and Occidental. Nonetheless, Gothaer refused coverage to ABB or Occidental, and filed motions for summary judgment as to both.
In Gothaer’s motions for summary judgment against ABB and Occidental, the main point of contention revolved around the issue of insurable interest. According to Gothaer, neither ABB nor Occidental possessed insurable interests and, therefore, lacked standing necessary to bring suit against Underwriters.
On June 4, 1996, this Court issued an Order on Defendant Gothaer’s Motions for Summary Judgment as to Plaintiffs ABB Power (“ABB”) and Occidental International (“Occidental”), (hereinafter, Gothaer Order ) denying Gothaer’s motions for summary judgment. In that Order, the Court not only denied Gothaer’s motions, but also granted partial cross-summary judgments to Plaintiffs ABB and Occidental on two issues. First, the Court determined, pursuant to the language of the insurance contract, that both “ABB and Occidental are assureds under the terms” of the insurance. Second, the Court concluded that “the jury verdict in 93-1144 does not estop ABB or Occidental from seeking a claim under the Gothaer insurance.”
Gothaer now moves to have this Court reconsider its decision in the Gothaer Order, and instead grant Gothaer’s motions for summary judgment. In particular, Gothaer discusses five (5) areas of apparent disagreement between what counsel for Gothaer believes the law to be, and what this Court has previously declared in the Gothaer Order. These are:
1. That “[t]he Court has no authority or discretion to ‘disagree with the Fifth Circuit’s ruling in Glukstad, and find that in the marine insurance context, *1572 Fla.Stat.Ann. § 672.501(2) is inapplicable.’ ” Gothaer Motion to Amend at 2 (quoting Gothaer Order, p. 16);
2. That the Fifth Circuit’s decision in York-Shipley, Inc. v. Atlantic Mutual Insurance Co., 474 F.2d 8, 9 (5th Cir.1973), Farbwerke Hoeschst AG. v. M/V “Don Nicky”, 589 F.2d 795, 797-98 (5th Cir.1979) and Sig M. Glukstad, Inc. v. Lineas Aereas Paraguayas, 619 F.2d 457 (5th Cir.1980), which this Court is compelled to follow, mandate that the Court find that neither ABB nor Occidental have an insurable interest. Gothaer Motion to Amend at 2-3;
3. That pursuant to the same cases as in # 2 above, this Court must vacate its “summary conclusion ‘[t]hat ABB and Occidental are named insureds under the Cover Note defining coverage in this case....’” Gothaer Motion to Amend at 3 (quoting Gothaer Order, p. 23);
4. That “[i]f the Court cannot rule as a matter of law that the Verdict and Final Judgment in Case No. 93-1144 do not bar ABB’s and Occidental’s claims against Gothaer, the Court cannot summarily conclude ‘[t]hat the jury verdict in Case No. 93-1144 has no collateral estoppel effect on the issue of policy exclusions in this ease.’ ” Gothaer, Motion to Amend at 3 (quoting Gothaer Order p. 23); and, finally;
5. That “[wjithout notice and a pending Motion, the Court cannot enter summary judgment in favor of ABB and Occidental based on ‘ABB’s response and Occidental’s adoption thereof,’ ... [and that] such a ruling contravenes the Order Denying ABB Power T & D Company, Inc’s Motion for Summary Judgment [against Gothaer],” Gothaer Motion to Amend, at 4 (quoting Go-thaer Order, p. 1).
In support of the five bases for reconsideration, Gothaer produces the exact same arguments, cases, and discussions raised in the earlier motions for summary judgment. Asa preliminary matter, the Court should dismiss the current Motion to Alter or Amend as constituting an improper use of the rules of procedure. As ABB has pointed out in its response to the current motion, “the purpose of a motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence.” Z.K. Marine, Inc. v. M/V Archigetis, 808 F.Supp. 1561, 1563 (S.D.Fla.1992), quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3rd Cir.1985), cert. denied, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986), and thus, it “should not be used as a vehicle to present authorities available at the time of the first decision or to reiterate arguments previously made.” Id. (emphasis added). More to the point, it is impermissible for a party to use a motion for reconsideration:
to ask the Court to rethink what the Court ... already thought through — rightly or wrongly.... The motion to reconsider would be appropriate where, for example the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. A further basis for a motion to reconsider would be a controlling or significant change in the law or facts since the submission of the issue to the Court. Such problems rarely arise and the motion to reconsider should be equally rare.
Id. (citations omitted). Because motions for reconsideration are looked upon with such disfavor, “district courts are necessarily afforded substantial discretion in ruling on” them. Sussman v. Salem, Saxon & Nielsen, P.A., 153 F.R.D. 689, 694 (M.D.Fla.1994).
Gothaer has not presented any new evidence, arguments, cases or principles not already cited to the Court in support of its motions for summary judgment. As such, the present motion should be denied, without comment, on the basis that it constitutes nothing more than a continuing disagreement by counsel with this Court’s interpretation of the law. Nonetheless, the Court believes that all sides in this dispute will benefit from further explication of the reasons underlying the Court’s earlier Orders. Further, Go-thaer’s claims of conflict between this Court’s Order Denying ABB Power T & D Company, Inc’s Motion for Summary Judgment on *1573 Amended Counterclaim of Defendants, Go-thaer ... (February 8, 1996), and the Go-thaer Order require clarification — even if they do not mandate reconsideration.
A.
At the outset, the Court rejects Gothaer’s contention that the granting of summary judgment to ABB and Occidental without requiring the filing of opposing motions was improper. The Supreme Court of the United States, in clear language, fully supported the proposition that summary judgment may be entered without the filing of a formal motion. According to the Court, “district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the losing party was on notice that she had to come forward with all of her evidence.” Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Indeed, “the weight of authority is that summary judgment may be rendered in favor of the opposing party even though he has made no formal cross-motion under Rule 56.” Bank of Lexington v. Jack Adams Aircraft Sales Inc., 416 F.Supp. 17, 20 (N.D.Miss.1976), rev’d on other grounds, 570 F.2d 1220 (5th Cir.1978). A leading treatise on the rules of civil procedure in federal courts, Wright & Miller, Federal Practice and Procedure § 2720 at 28-35 (1983 & Supp.1996), relied upon in numerous eases in this circuit and others, fully supports the proposition that the Court may grant summary judgment to an opposing party without requirement of formal motion. See e.g., Marshall v. Sunshine & Leisure, Inc, 496 F.Supp. 354 (M.D.Fla.1980); Doe v. Rockingham County School Board, 658 F.Supp. 403, 406 (W.D.Va.1987).
As the above demonstrates, granting of summary judgment to a non-moving party is appropriate so long as the losing party is given notice and opportunity to present any further evidence it may have on the subject. Gothaer has argued in its present motion that this Court granted summary judgment to ABB and Occidental “[w]ithout notice.” If this were in fact true, the Court would admit overstepping its bounds. However, any review of the record reveals that Gothaer was adequately apprised that both ABB and Occidental were seeking summary judgment against it. In particular, in ABB’s Memorandum in Opposition to Gothaer Defendant’s Renewed Motion for Summary Judgment, (“ABB Memo”), ABB explicitly requested that “with regard to issues raised by these motions [referring to Gothaer’s motions against ABB and Occidental], the Court should grant summary judgment in ABB and Occidental’s favor.” ABB Memo, at 2. ABB went on to request, specifically, that the Court adjudge that “ABB has an insurable interest in the Transformer; Occidental has an insurable interest in the transformer [and].... the Verdict and Final Judgment in Case No. 93-1144-CIV-ARKINS [sic] do not collaterally estop ABB or Occidental from claiming against Gothaer.” Id.
These requests for summary judgment, contained in ABB’s responsive pleading to Gothaer’s motion, put Gothaer on notice that ABB and Occidental (by its later adoption of ABB’s response), were seeking summary judgment against it; a request that the Court would necessarily consider granting. Gothaer was provided an opportunity to answer ABB’s responsive pleading, and did so in the form of its reply. Gothaer was, therefore, provided with a forum to put forward any other evidence it may have had in opposition to ABB and Occidental’s positions.[5]
*1574 The Court would point out that the two areas upon which summary judgments were granted did not require extensive review or consideration of factual or evidentiary disputes. This Court, in declaring that both ABB and Occidental possessed insurable interests at the time of the accident, based its decision largely, if not completely, on uncontested facts and interpretations of law. Further, this Court’s determination that collateral estoppel, based on the July’s general findings of liability in Case No. 93-1144, is inapplicable required no factual examination and required nothing more than a review of the record of the previous ease.[6] In the end, Gothaer has not offered any compelling reason, or contrary caselaw, to support a reconsideration of this Court’s decision.
B.
These above “procedural” objections aside, the main point of Gothaer’s current motion is that this Court has overstepped its bounds by “disagreeing” with the Fifth Circuit’s opinion in Glukstad.[7] In particular, Gothaer has alleged, albeit couched in more discrete language, that this Court overzealously asserted its authority by effectively placing itself above that of the Court of Appeals. The essence of Gothaer’s misunderstanding of this Court’s holding is that Gothaer believes that this Court has chosen to ignore binding precedent solely on the authority of its own opinion of the law. As should be apparent from the holding and rationale of the Gothaer Order, this is not so. However, because the Court recognizes that Gothaer *1575 has misapprehended the extent of the Court’s holding, it is necessary to, once again, visit the question of insurable interest under the present policy.
Contrary to Gothaer’s characterizations, this Court is well aware and acutely responsive to its place in this judicial system. This Court would never disregard or refuse to follow otherwise binding and valid precedent. By “disagreeing” with the Fifth Circuit’s opinion in Glukstad, this Court did not “re-fus[e] to follow ... Fifth Circuit precedent which bind this Court.” Gothaer memo, at 4. Instead, this Court determined that it was required to reject the holding of Glukstad and others, based on other binding precedents more directly on point. Specifically, after extensive review of applicable caselaw this Court determined that binding precedent of the United States Supreme Court, the Eleventh Circuit and the former Fifth Circuit mandated that this Court not adopt the approach as outlined in Glukstad and others — an approach which, in the end, this Court finds is not even applicable to the situation at hand.
The basis of this Court’s decision largely rested on the answer to the question — what law governs the interpretation of marine insurance contracts? In answering this question, the obvious starting point is the Supreme Court’s opinion in Wilburn Boat Co. v. Fireman’s Fund Insurance Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955).
Prior to the decision in Wilburn, courts consistently held that “a contract of marine insurance is a maritime contract, within the admiralty and maritime jurisdiction ... of the United States Courts.” Irwin v. Eagle Star Insurance Co., 455 F.2d 827, 828-29 (5th Cir.1972) (citing New England Mutual Marine Insurance Co. v. Dunham, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870)).[8] Courts further held that as marine insurance policies are maritime contracts, the proper source of law for their interpretation lies in admiralty. Indeed, prior to 1955, it is clear that courts understood that “state law is admissible to modify or supplement admiralty and maritime law only when the state action is not hostile to the characteristic features of the maritime law.” Wilburn Boat Co. v. Fireman’s Fund Ins. Co., 201 F.2d 833 (5th Cir.1953), rev’d, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); C.F. Romero v. International Terminal Operating Co., 358 U.S. 354, 377-78, 79 S.Ct. 468, 483, 3 L.Ed.2d 368 (1959) (“the source of admiralty rights [is] a controlling body of admiralty law.... the supremacy of federal maritime law over conflicting state law [and] the federal nature of the maritime law administered in the federal courts has long been an accepted part of admiralty jurisprudence”); The Western Maid, 257 U.S. 419, 432, 42 S.Ct. 159, 160, 66 L.Ed. 299 (1922); The Lottawanna, 88 U.S. (21 Wall.) 558, 22 L.Ed. 654 (1874).
However, in Wilburn, the Supreme Court rejected this previously held belief, finding that “[t]he whole judicial and legislative history of insurance regulation in the United States warns us against the judicial creation of admiralty rules to govern marine policy terms and warranties.” Wilburn, 348 U.S. at 316, 75 S.Ct. at 371. In so declaring, the Court declared, “[t]he control of all types of insurance companies and contracts has been primarily a state function since the States came into being.” Id.
Based on these important state interests the Court greatly limited the role federal admiralty law would play in the interpretation of marine insurance contracts. Specifically, the Court determined that state law, not federal, ordinarily governs the inteipre-tation of such contracts and that admiralty law would thereafter be confined only to those limited areas in which earlier doctrines were firmly entrenched. Id. at 315-21, 75 S.Ct. at 371-75. Although a preference for state law was clearly established by the decision in Wilburn, federal admiralty law was not completely written out of the equation. To the contrary, the Court specifically held that an “established” rule of admiralty law reigns supreme over contrary state law provisions. Id. at 312, 75 S.Ct. at 370-71. Out *1576 of the Wilburn decision, have come an array of Fifth and Eleventh Circuit opinions, as well as opinions of the Supreme Court, attempting, in one way or another, to explain or clarify the holding of Wilburn in relation to questions of marine insurance.
For instance, the Supreme Court, in Kossick v. United Fruit Co., 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961), held that where a contract is essentially maritime, maritime law should govern its interpretation unless state law concerns so overwhelm those of federal that the matter is deemed local. According to the Court, where “the alleged agreement [is] sufficiently related to peculiarly maritime concerns as not to put it, without more, beyond the pale of admiralty law.... [and] such a contract as may well have been made anywhere in the world ... the validity of it should be judged by one law wherever it was made” — that “one law,” of course, referring to maritime law. Id. at 741, 81 S.Ct. at 893. However, the Court left one caveat, and that is, where “the contract, though maritime, is ‘maritime and local,’ ... in the sense that the application of state law would not disturb the uniformity of maritime law_”, state law may apply. Id. at 738, 81 S.Ct. at 892 (citations omitted).
The Fifth Circuit has read Wilbwrn and, at times, Kossick as mandating a “weighing” of interests, and where such interests favor state law, state law governs. Irwin v. Eagle Star Insurance Co., 455 F.2d 827, 830 (5th Cir.1972) (“After weighing the circumstances of this case in the light of the factors controlling the decision in Kossick, we conclude that Florida law should be applied.... [T]he insurance contract ... in this case is one in which Florida has substantial and legitimate interest”). In Olympic Towing Corp. v. Nebel Towing Co., 419 F.2d 230 (5th Cir.1969), cert. denied, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970), the Court held that where conflicts between state law and admiralty law are “so minimal as to be insignificant,” the state law principle governs. Id. at 235. In other cases, the Fifth Circuit has limited Wilburn to its facts, and expressed a general preference for admiralty law in cases involving marine insurance. D.J. McDuffie Inc. v. Old Reliable Fire Insurance Co., 608 F.2d 145,147 n. 1 (5th Cir.1979). The ineon-gruencies apparent in the decisions of the above cases, spurred the Fifth Circuit, in 1991, to admit that they represent “varying, and arguably inconsistent, approaches....” Albany Insurance Co. v. Anh Thi Kieu, 927 F.2d 882, 887 n. 3 (5th Cir.1991), reh. denied, 934 F.2d 1263 (1991), cert. denied, 502 U.S. 901, 112 S.Ct. 279, 116 L.Ed.2d 230 (1991). In the Albany decision, the Fifth Circuit ultimately articulated three factors that courts must consider when determining governing law:
(1) whether the federal maritime rule constitutes “entrenched federal precedent,” ... (2) whether the state has a substantial and legitimate interest in the application of its law, ... (3) whether the state’s rule is materially different from the federal maritime rule....
Id. at 886 (citations omitted). With these elements in mind, the Fifth Circuit fully announced the proposition that “the presumption of state law is ... ‘axiomatic,’ ” but that where state law and federal maritime law conflict, “state law generally should not govern.” Id. (citations omitted).[9] Since the decision in Albany, the law of the Fifth Circuit seems well-settled. Further, although never explicitly addressed, the decision in Albany may draw some earlier decisions into doubt that were based on arguably and admittedly “varying and ... inconsistent” interpretations of Supreme Court precedent. As such, there is some support for the proposition that the Fifth Circuit’s decisions in Glukstad and others, insofar as those decisions may be read as involving maritime law,[10] are now cast into doubt as firm precedent. However, for purposes of this motion, the Court has considered Glukstad and other cases cited by Gothaer, as constituting valid precedent for points addressed.
The Eleventh Circuit’s interpretations of the holdings in Kossick and Wilburn have *1577 paralleled those of the Fifth. In 1986, in Steelmet Inc. v. Caribe Towing Corp., 779 F.2d 1485 (11th Cir.1986), the Court instructed on the following:
One must identify the state law involved and determine whether there is an admiralty principle with which the state law conflicts, and, if there is no such admiralty principle, consideration must be given to whether such an admiralty rule should be fashioned. If none is to be fashioned, the state rule should be followed. If there is an admiralty-state law conflict, the comparative interests must be considered— they may be such that admiralty shall prevail, as in Kossick, or if the policy underlying the admiralty rule is not strong and the effect on admiralty is minimal, the state law may be given effect....
Steelmet, 779 F.2d at 1488. This seemingly clear indication that “admiralty courts will generally look to appropriate state law in determining questions involving a marine insurance contract,” Gulf Tampa Drydock Co. v. Great Atlantic Insurance Co., 757 F.2d 1172, 1174 (11th Cir.1985), based on interpretations of Wilburn and Kossick, was thrown into some doubt by the later decision of Kilpatrick Marine Piling v. Fireman’s Fund Insurance Co., 795 F.2d 940 (11th Cir.1986). In Kilpatrick, the Eleventh Circuit rejected an attempt to read Wilburn as advocating a balancing of interests between state and maritime interests. According to the Court, Wilburn “applied state law when it found no federal admiralty law_ It did not ... weigh the relative importance of the state and federal law.... There simply was no federal law.” Kilpatrick, 795 F.2d at 948. Thus, the Court in Kilpatrick, finding that maritime law existed on the subject before it, refused to consider whether state interests may override maritime interests, and therefore applied maritime law unrefleetively.
Later, in Lexington Insurance Co. v. Cooke’s Seafood, 835 F.2d 1364 (11th Cir.1988), the Court of Appeals affirmed the decision of the District Court for the Southern District of Georgia in Lexington Insurance Co. v. Cooke’s Seafood, 686 F.Supp. 323 (S.D.Ga.1987). In the lower court decision, Judge Edenfield held that navigational limits warranties, found in marine insurance contracts, were to be interpreted according to federal maritime law. This decision was reached even where a Georgia statute directly conflicted with the maritime rule. According to Judge Edenfield, as navigational limits warranties are “peculiarly maritime in nature.... the uniformity so essential to a coherent body of admiralty law” required an application of the maritime principle.[11] Lexington, 686 F.Supp. at 328. The findings of the court in Lexington were provided further support by the fact that the maritime doctrine “neeessit[ating] strict adherence to the terms of this type of express warranty [navigational limits] was clearly established prior” to Wilburn. Id. at 328.
Later eases in the Eleventh Circuit have followed the rationale described in Lexington. In particular, in a recent decision of the Eleventh Circuit, Hilton Oil Transport v. T.E. Jonas et al., 75 F.3d 627 (11th Cir.1996), the Court of Appeals declared that, at least in the area of breaches of warranties under marine insurance contracts, “the admiralty cases ... are legion and form a judicially entrenched federal admiralty rule.” Hilton Oil, 75 F.3d at 630. After finding the principles governing breaches of warranties “legion” and “entrenched,” the Court of Appeals did not launch into an exposition of whether or not Florida’s interest in governing warranty breaches might outweigh federal interests. Instead, the Court merely concluded, “federal admiralty law, not state law, would control,” this issue. See also Home Insurance Co. v. Vernon Holdings, 1994 WL 791971 (S.D.Fla.1994).
Obviously, the issue of admiralty versus state law in the interpretation of marine insurance contracts, is a highly amorphous and confusing aspect of federal jurisprudence. Nonetheless, the Court, recognizing *1578 its place within the judicial system, has not, and will not, attempt to reinvent the wheel in order to determine what law governs the interpretation of any specific contract. Rules of stare decisis instruct this Court that when confronted with seemingly inconsistent principles and rulings, all effort should be made to reconcile and follow both. Where such reconciliation is not possible, the Court generally looks to the decision of the most recent, and binding panel. With this is mind, the most recent decision to have expressed any opinion on the subject is Hilton Oil. As was stated above, the discussion of what law to apply in that ease did not attempt to weigh interests. It merely found “entrenched admiralty law,” and declared that it must apply, even where conflicting state law existed.
Applying the law as set out in Hilton Oil, Lexington and Wilburn, this Court formulated the following procedure for determining what law governed the interpretation of the marine insurance contract in this case:
The Court, when confronted with a specific . coverage question, must first look to admiralty law to determine whether an applicable principle governs that particular question. If such a principle exists, then that principle will govern; if not, then state law may be invoked. Finally, if state law principles exists [ sic ] which are contrary to an express and entrenched principle of admiralty law, admiralty law will preempt that particular state law provision.
Gothaer Order at p. 9 (citations omitted). Although differing semantically from the directives of the Eleventh Circuit in Steelmet and its progeny, the legal process as evidenced in this Court’s procedure is substantially the same as the holdings of prior case-law.
C.
Employing the procedure discussed above, the first step is to determine whether any principle of admiralty law exists that may control the issues in the case. The initial finding essential to this ease is whether or not ABB and Occidental are named assureds under the policy in question. This issue was fully resolved in the Gothaer Order and Gothaer has not argued for reconsideration on this issue. Essentially, the Court held that a policy written on account of a named party “&/or other parties as may be required,” was legally the same as the more common method of issuing policies “for account of whom it may concern.” According to leading treatises and binding federal precedent on the subject, policies written “for account of whom it may concern” insure any parties that possess an insurable interest in the property at the time of damage. 45 C.J.S. Insurance § 394 (1993); Hooper v. Robinson 98 U.S. 528, 25 L.Ed. 219 (1878). Thus, the only remaining question before the Court in the Gothaer Order was whether or not ABB or Occidental possessed an insurable interest, and whether or not the definition of that term was to be found in maritime or state law.
As was fully discussed in the Gothaer Order, this Court finds that, indeed, there exists an entrenched principle of federal admiralty law on the issue of insurable interest in the marine insurance context. As early as 1878, the Supreme Court in Hooper v. Robinson, 98 U.S. 528, 537, 25 L.Ed. 219 (1878), pronounced the legal meaning of insurable interest in marine insurance. According to the Court:
A right of property in a thing is not always indispensable to an insurable interest. Injury from its loss or benefit from its preservation to accrue to the assured may be sufficient, and a contingent interest thus arising may be made the subject of a policy-
Id. at 538. The clear holding of this decision of the Supreme Court of the United States is that an insurable interest in a thing, does not require title or a security interest. By not requiring any ownership interest in the property, the Court was able to envision a multitude of relationships that create insurable interests, including “agent, factor, bailee, carrier, trustee, consignee, mortgagee, and every other lien-holder.” Id. at 538. Finally, the Court went on to declare that “numerous as are the parties of the classes named, they are but a small portion of those who have the right to insure. ” Id. (emphasis added).
Subsequent decisions have reaffirmed the principles announced in Hooper. In 1896, in *1579 Harrison v. Fortlage, 161 U.S. 67, 65, 16 S.Ct. 488, 490, 40 L.Ed. 616 (1896), the Supreme Court reaffirmed and solidified the holding of Hooper. In Harrison, the Court considered the question whether a buyer of goods possessed an insurable interest in them, prior to transfer of title. In holding that the buyer did possess such an interest, the Court declared, “it is well settled that any person has an insurable interest in property, by the existence of which he will gain an advantage, or by the destruction of which he will suffer a loss, whether he has or has not any title in, or lien upon, or possession of the property itself.” Harrison, 161 U.S. at 65, 16 S.Ct. at 490 (emphasis added). Thus, by 1895, the Supreme Court had declared the principles first enunciated in Hooper to have been well-settled or entrenched. Applying these principles, the Court determined that the buyer did indeed have an insurable interest “by reason of the title which would accrue to [it] upon arrival and delivery, and óf the injury which they might suffer by a previous loss of the goods.” Id.
Numerous decisions in courts of nearly every federal circuit, and most state courts, have consistently upheld the common law rule as announced in Hooper, either by directly referencing Hooper, or by reference to state statutes incorporating the holding of that case. See Atlas Assurance Co. Ltd. v. Harper, Robinson Shipping Co., 508 F.2d 1381, 1386 (9th Cir.1975) (arguing, in dicta, that although the insured’s insurable interest was not contested, the rule in Hooper would govern if contest had been offered). C.f. The Sidney et al., 23 F. 88, 92 (S.D.N.Y.1885) (finding that a consignee, carrier and a third party acting as broker, all had “an insurable interest in [the goods] to the extent of his liability”); Noland Co. v. Chelsea Housing Corp., 128 F.2d 872 (3rd Cir.1942); Parks v. Federal Crop Insurance Corp., 416 F.2d 833, 839 (7th Cir.1969); Burroughs Corp. v. Barry, 380 F.2d 427, 432 (8th Cir.1967); Suggs v. State Farm Fire & Casualty Co., 833 F.2d 883, 887 (10th Cir.1987); Milan v. Providence Washington Insurance Co., 227 F.Supp. 251 (E.D.La.1964); Trinidad Publishing Co. Ltd. v. M/V Arawak Sun, II, 1995 WL 6287 (E.D.La.1995). The fact that questions of “insurable interest” have not often come before the courts in the context of marine insurance after Harrison is not surprising given the universal understanding of the term. The lack of caselaw directly on point is also easily explained by the fact that the vast majority of states have enacted legislation which fully comports, and often references, the decisions in Hooper and Harrison. See Groban v. S.S. Pegu, 331 F.Supp. 883, 895 & nn. 7-11 (S.D.N.Y.1971), aff'd 456 F.2d 685 (2d Cir.1972). Gothaer has argued that Groban “undermines this Court’s rejection of Glukstad as controlling precedent.” Go-thaer, Motion to Amend at 6. According to Gothaer, the court in Groban held that insurable interests should be determined by the law of the state having jurisdiction over the matter. On the surface, this is a correct interpretation of the decision. However, in footnote 11 to that opinion, the court specifically noted:
None of the parties advert to the somewhat obscure question whether insurable interest under the open policy, obviously a marine contract, is to be determined under the general maritime law or by state law. Since there is no conflict between the general maritime law and the law of any jurisdiction possible involved, this question need not be discussed.
Groban, 331 F.Supp. at 896 n. 11 (citations omitted and emphasis added).
Groban provides an excellent example of why there are not more cases directly considering the question whether title is an indispensable element of insurable interest in marine insurance policies — either state law is identical, and therefore no discussion of conflict between maritime law and state law need be had, or else the parties stipulate to the control of state law. See also Windward Traders, Ltd. v. Fred S. James & Co. of New York, Inc., 855 F.2d 814 (11th Cir.1988) (applying state law by stipulation). The Court also notes no treatise or article has been cited or found which argues for anything other than the continued validity and application of Hooper and Harrison. See generally 44 C.J.S. Insurance § 245 (1993) (in the context of marine insurance “if insured will sustain loss from the destruction of the subject matter or derive benefit from its preserva *1580 tion, this is sufficient to constitute an insurable interest_”); Thomas J. Sehoenbaum, Vol. II Admiralty and Maritime Law § 19-6 at 418-21 (1994); Brendan P. O’Sullivan, Marine Insurance § 8.4 at p. 304 — 5, in Maritime Law and Practice (2d ed. 1987) (Published by the Florida Bar); Grant Gilmore & Charles L. Black, The Law of Admiralty 60-61 (1975). See also Robert Bocko, et al., Marine Insurance Survey, 20 TUL. MAR.L.J. 5, 11-12 (1995); Donald T. Rave & Stacey Tranchina, Marine Cargo Insurance: An Overview, 66 TUL.L.REV. 371, 382 (1991).
Based on a consideration of all of the above, this Court ascertained that 'under federal admiralty law, “insurable interest” is easily understood to mean “any pecuniary interest.” Further, the Court determined that this principle of maritime law was “entrenched” and fully applicable in the case.
D.
No case has ever been brought to this Court’s attention, nor has one been found by substantial independent research, holding that the ruling of Hooper, Harrison or others, has ever been specifically repudiated, questioned, vacated, or overturned. No ease has ever held that “insurable interest,” under federal admiralty law, possesses any meaning different from that originally ascribed to it by the Supreme Court in 1887 in Hooper,[12], and as later applied in Harrison, Groban and Atlas.
However, standing in direct opposition to the federal maritime rule is a provision of the Florida Uniform Commercial Code. According to Fla.Stat.Ann. § 672.501 (emphasis added):
(2) The seller retains an insurable interest in goods so long as title to or any security interest in the goods remains in him....
Thus under applicable portions of the Florida U.C.C., insurable interest is legally defined as requiring “ownership or security interest.” Gothaer argues, that this provision of the U.C.C. should override the previously entrenched maritime rule. Objecting to this Court’s conclusion in the Gothaer Order that the Florida provision did not override federal maritime law, Gothaer states:
The Court’s analysis also overlooks the obvious: The Uniform Commercial Code did not exist before 1952, and most states began adoption after publication of the 1962 text.... That the Court did not find reference to the Uniform Commercial Code in nineteenth century Supreme Court opinions dealing with admiralty matters is thus understandable.
Gothaer, Motion to Amend at 5. Gothaer’s argument seems to be either that the enactment of the Florida U.C.C. preempts preexisting federal law, or alters such federal law to conform with it, without the need for Congressional or judicial action. This is clearly not so.
According to the clear dictate of Wilburn, federal maritime law, where entrenched, preempts state law, and controls the interpretation of a marine insurance contract. The fact that a state law exists, in direct conflict with a federal maritime rule is a factor to be taken into account when determining what law to apply, but that is a far cry from stating the proposition that, since the state law is newer it must reign supreme. Florida courts, confronted with the identical question have concluded that provisions of *1581 the Florida U.C.C., which conflict with preexisting (even nineteenth century) federal maritime rules, are preempted. See Aetna Ins. Co. v. Dudney, 595 So.2d 238, 239 (Fla. DCA 1992) (holding that, even in the face of conflicting Florida U.C.C. provisions, federal maritime law provides the rule of application for interpretation of navigational limits warranties in marine insurance). See also Vernon, 1994 WL 791971 at * 4.
Further, binding Fifth and Eleventh Circuit precedent mandate that when confronted with conflicting federal and state provisions, the state law is looked upon with disfavor. As the Fifth Circuit has set down in Albany, “state law should not be applied (in maritime cases) unless it bears a reasonable similarity to the federal maritime practice.” Albany, 927 F.2d 882. Indeed, this rule of conflicts seems axiomatic given the Supreme Court’s basic directive in Wilburn that federal maritime law, where entrenched, preempts state law.
Thus, where as here the state law provision is in direct conflict with an entrenched principle of federal law, there is a general, if not mandatory preference for applying the federal law. However, under the holding of Kossick, Albany, and even Steelmet, it is possible that state law may form the basis of the Court’s interpretation if it can be shown that Florida’s interests in the issue before the court far outweigh the interests of the federal maritime rule, thereby finding that the issue is more local than maritime. See Kossick, 365 U.S. at 738, 81 S.Ct. at 892. However, it is impossible to characterize the present issue as inherently local, or as not affecting maritime interests in general. On one level, it is obvious that the Florida statute at issue in this case differs materially from statutes that would otherwise govern this case were it to arise in other states. See Groban, 331 F.Supp. at 895 & nn. 7-11. The disunity that would ensue from allowing one state to formulate rules, restrictively construing the term “insurable interest,” while the vast majority of other states provide a more liberal construction would disrupt the goal of uniformity inherent in the mere existence of a federal law of maritime.
It is a basic premise of maritime law that where application of state law “would defeat the reasonably settled expectations of maritime actors,” it should not be applied. Albany, 927 F.2d at 887. The Court finds that maritime actors, accustomed to the application of the holding in Hooper, and as announced in the leading treatises on maritime law would be greatly prejudiced by allowing Florida’s interest to preempt, or overrule entrenched maritime interests and application in this area. As such, the marine insurance contract at issue here is inherently maritime, and should be interpreted under that “one law” as mandated in Kossick.
E.
It is important to note that Gothaer does not object to the Court’s determination that federal law preempts Florida law in this area. To the contrary, Gothaer in its filings has repeatedly urged the proposition that maritime law should control in this case. Where Gothaer departs from this Court’s rationale is over the issue of what that maritime law is. This Court finds that the clear holdings of Hooper, Harrison, and Atlas, as well as the near complete adoption of the holdings of those cases into state laws and scholarly publications, reveals the applicable principle of federal maritime law. Conversely, Gothaer argues that the “true” principle of federal maritime law corresponds with the holdings of a line of binding Fifth Circuit cases beginning in 1973 with Yorkr-Shipley and culminating in the Fifth Circuit’s Gluk-stad decision in 1980.
According to Gothaer, in these eases the Eleventh Circuit set down the governing, and entrenched, principle of federal admiralty law on insurable interest as requiring title or a security interest in the matter insured. If this is so, it must have been accomplished one of two ways, (1) either the Eleventh Circuit, through the former Fifth Circuit, has decided to deviate from preexisting Supreme Court determinations of what constitutes an insurable interest under federal maritime law; or (2) the Eleventh Circuit has determined that no entrenched principle of federal maritime law exists on the subject, and therefore Wilburn dictates *1582 that Florida law should govern. Admittedly, if the Eleventh Circuit has made either of these determinations, this Court would be bound to follow regardless of the existence of prior precedent or conflict with other jurisdictions. However, before deviating from principles established for over 100 years, it is incumbent on the Court to fully ascertain whether the Eleventh Circuit has done what Gothaer claims it has. Upon review of the applicable cases, this Court finds that it has not.
Gothaer is correct that York-Shipley, as in this case, involved a suit by the holder of an open-marine cargo policy against its insurer. Further, as here it was uncontested that the claimant possessed neither title nor a security interest in the property at the time of loss.[13] However, unlike this case the court in York-Shipley did not interpret insurable interest under the terms of an open-marine insurance contract written “on account of whom it concerns.” Instead, the case revolved around a “special policy” issued by the policy-holder “for the benefit of its customers abroad.” York-Shipley, 474 F.2d at 8. The pertinent part of the marine policy granting the power to issue special policies reads as follows:
Authority is hereby given to the assured to issue this company’s special policies of insurance which will be supplied on request. Such special policies are to be issued only in accordance with the terms and conditions of the policy and are not transferra-ble unless countersigned by the assured.
Id. As the Fifth Circuit made clear, the “special policy takes the place of the open policy with respect to the particular shipment.” Id. Although never fully articulated in the decision, it seems apparent that the special policies in question, as written solely for the benefit of the consignee, restricted insurable interest to an ownership interest in ways that policies written “for account of whom it may concern” do not.[14] Thus, in order to determine whether York-Shipley had standing to sue, the only question before the Court was at what time under a C.I.F. shipment title passed from the seller to the consignee; the answer to that question falling squarely under the Florida U.C.C.
The Fifth Circuit’s decision in Farbwerke Hoeschst is even less compelling. In Farb-werke Hoeschst, the sole question before the Court was whether representative suits by shippers may be brought on behalf of unnamed owners of goods. The Court, holding that such suits are allowed only in circumstances not present in that case (i.e. where ratification is present), did favorably discuss the holding of York-Shipley. However, the court was not interested, nor does it seem to have considered, the question whether a seller may have an insurable interest in a marine insurance policy written “on account of whom it may concern,” under federal maritime law.
Glulcstad is equally unavailing as reason for concluding the rule of Hooper has been abandoned or altered by this Circuit. As in the cases discussed above, it is impossible to tell whether the marine insurance policy in question was written “on account of whom it may concern” or other similar language. For this reason, the individuals who are given the capacity to recover under the policy may have been restricted to only those individuals having an ownership interest in the property. Further, any review of the decision in Glukstad reveals that the question of “insurable interest” under federal maritime law was never raised by the court, or seemingly by the parties in the ease. In as far as the court may have concerned itself with questions of general maritime law, such Con- *1583 cems are not apparent from the decision, and will not be read into it by this court.
Thus, the three cases upon which Gothaer rests nearly its entire argument never once specifically implicate federal maritime law. Further, there is no indication in York-Ship-ley, for instance, whether the special insurance policies at issue in that case required an ownership interest in the assured, or whether the parties in Glukstad may have stipulated to Florida law, thereby short-circuiting the need for the Court in that case to consider questions of federal maritime law. Such is not the case here.
Gothaer has repeatedly urged this Court to apply federal maritime law. Conversely, ABB Power and Occidental have urged an application of Florida law.[15] As such, the issue has been put squarely before this Court whether federal maritime law or state law should apply. Based on principles established for over 100 years, with continued application over that period, this Court has determined that federal maritime law on the issue of “insurable interest” in marine insurance policies written “on account of whom it may concern” is entrenched and supreme. This Court reiterates that no opinion, or act of Congress, has ever been produced by Go-thaer, or through independent research, which in any way alters or even questions the holdings originally pronounced in Hooper and Harrison. But see El Fenix de Puerto Rico v. Serrano Gutierrez, 786 F.Supp. 1065, 1069-72 (D. Puerto Rico 1991) (case arising under admiralty, the court determined, without any citation, that ownership is prerequisite to finding insurable interest).
Thus, all that need be shown for ABB or Occidental to have an insurable interest in the cargo, and by consequence be named insureds under the policy is that the parties have any pecuniary interest in the transformer at the time of the accident. Unquestionably, both ABB and Occidental have suffered an economic loss as a result of the destruction of the transformer. The jury verdict in 93-1144 has settled the matter of what loss the parties may have suffered stemming from the accident. The jury in that case awarded damages to ABB in the amount of $1,494,000 and to Occidental $98,-309.59. Although these amounts may not conclusively determine the full extent of damages for this case, it would seem that they automatically foreclose the possibility of arguing that no damage was suffered by ABB or Occidental.
Further, any review of the record reveals that neither ABB nor Occidental was paid for ALM 3030 — a common occurrence when goods are never delivered. Subsequent payments for a replacement transformer cannot take the place of the economic harm suffered by both Plaintiffs through the destruction and failed delivery of ALM 3030. Thus, the fact that both ABB and Occidental suffered economic harm stemming from the accident unequivocally settles the question whether they possessed an insurable interest in ALM 3030, at the time of the accident.
F.
For reasons stated above, the holdings of York-Shipley, Farbwerke Hoeschst, and Glukstad do not, under any interpretation, compel this Court to overlook, or consider changed, the entrenched principle of maritime law that has been applied. Those cases do, however, definitively mandate that in cases not specifically controlled by federal maritime law, an ownership interest is required for a finding of insurable interest under Florida law — which brings this court to its final point of discussion.
Gothaer argues that this Court’s Gothaer Order (holding that Glukstad does not control the definition of “insurable interest” under federal maritime law) and the Order on ABB’s and Arkwright’s Motion for Summary Judgment (relying on Glukstad for the proposition that “ownership” is a requirement to insurable interest) are inconsistent— they are not.
The marine policy issued by Gothaer to cover the transformer is indisputably a maritime contract. As such, federal maritime law, where entrenched, governs the interpretation of such contracts. For the reasons explained in exhaustive detail above, *1584 Glukstad is -inapplicable in interpreting such contracts in this case.
As for the Arkwright policy, that instrument is an all-risk comprehensive property policy. The applicable portion of that document is a transportation endorsement which neither Arkwright nor ABB has attempted to argue falls under federal maritime law. By the issues as they are presented to the Court, both sides in the Arkwright/ABB suit have relied exclusively on interpretations of applicable Florida law. Whether federal maritime law should govern an exclusively inland transportation contract is an issue that has not been raised in that dispute, and need not be addressed. As such, given the Fifth Circuit’s binding interpretation of the applicable Florida statute governing insurable interest in a transportation contract, this Court interpreted that contract according to the dictates of the holdings discussed above. As such, there is no conflict between the two Orders, as Gothaer seems to imply.
G.
All other grounds for reconsideration stated by Gothaer are also meritless and do not require any further discussion. All conclusions reached in the Gothaer Order are affirmed and possess continued validity for the remainder of this cause. Gothaer’s Motion to Alter or Amend is DENIED.

. In the Gothaer Order, this Court noted an unusual amount of contention over the issue of ABB's assumption of Westinghouse’s interests in this matter. To be more specific, Gothaer throughout its submissions to the Court, has repeatedly made reference to an alleged improprie- *1570 1y in the relationship of ABB to transformer ALM 3030. Unfortunately, as the Court noted in the Gothaer Order, the form of this argument is con-clusoiy in nature and provides no guidance to the Court concerning what legal theories are being referenced, what evidence is being relied upon and what effect counsel believes this issue may have on this case’s ultimate resolution. In the Gothaer Order the Court directed that in the future, if this “issue" was to maintain viability, counsel should attempt to formulate a legal argument upon which this Court could then rule.
In the instant motion, Gothaer has not produced any new argument on this matter, and the Court will, therefore, adopt the same approach used in the Gothaer Order. The parties are again requested to refine argument on this point, if indeed there is argument to be made, in any further submissions to the Court or at trial. Until such time, the Court will refer to ABB and Westinghouse, collectively as ABB.

. Gothaer, in the current motion, has again argued that the evidence is clear that Occidental was acting solely as carrier or bailee at the time that the accident occurred. The Court again rejects this argument for reasons stated in the Gothaer Order.

. Although the Court recognizes that no policy, as that term is usually defined, was issued in this matter, for ease of description, the Court will, at times, refer to the Cover Note as a policy. The effect is no different given the circumstances of this case.

. The special verdict form was agreed to by all parties. TR:1233, 1238. The special verdict form asked several questions regarding whose negligence caused the damage to the transformer and the crane. It also asked the jury to allocate percentages of fault among Lane Crane, Occidental and ABB and to state the total amount of damages to the crane suffered by Lane Crane, to the transformer suffered by ABB and suffered by Occidental for consequential damages.

. The Court is, of course, aware that it had earlier denied ABB’s and Occidental's motions for summary judgment on these very issues. However, the denial of those motions was made after the filing of Gothaer’s reply in support of its own motion. As such, Gothaer may not now argue that it withheld evidence, or failed to produce argument in opposition to ABB’s request for summary judgment on the grounds that it believed it was insulated from any adverse summary judgment by the Court's denial of ABB and Occidental's motions.
Further, after conducting extensive independent research and further investigation into the record by the time of ruling on Gothaer's motions, the Court determined that the earlier decisions to deny ABB’s and Occidental’s motions were premature. However, rather than entering an order vacating, or amending the orders on ABB’s and Occidental’s motions, the Court, in order to quickly prepare this case for trial, opted to grant cross-summary judgment to ABB and Occidental in response to Gothaer's motions. *1574 The legal and factual effects are identical, and Gothaer may not now argue any prejudice.

. The Court also rejects Gothaer’s argument that "[i]f the Court cannot rule as a matter of law that the Verdict and Final Judgment in 93-1144 do not bar ABB’s and Occidental's claims against Gothaer," then the Court is powerless to declare that they have no collateral estoppel effect. In fact, the Court is somewhat bemused at Go-thaer's suggestion that the Court is without discretion in this area.
It is entirely within the province of the Court to make determinations as to the legal effect a prior verdict may have on a present controversy. Such discretion seems only enhanced when the prior verdict is one obtained in a matter over which this Court presided. As such, this Court once again reiterates its position that the general finding of liability by the jury in 93-1144, and the entry of Final Judgment, as to ABB cannot estop ABB from seeking its claims in the present trial.
The jury determinations in 93-1144 only apportioned fault, without specifically delineating the bases for finding fault. As such, it is entirely possible that the jury in 93-1144 found ABB and/or Occidental at fault for activities entirely unrelated to the policy exclusions relevant to this case. Although the most likely basis for finding ABB at fault may indeed encompass a finding of "inadequate markings,” it is entirely possible that the jury based its verdict on a belief that ABB had not provided sufficient technical support to Occidental, or had not personally supervised the lift. The fact that the Court can find other reasons, reasonable in their premises, upon which the jury may have based its verdict, necessarily vitiates any possibility of applying the doctrine of collateral estoppel in this circumstance.
By declaring that ABB is not estopped from pursuing its claims, the Court is necessarily finding that the findings of fault in 93-1144 have no collateral estoppel effect. The Court would point out to Gothaer, that by determining that ABB is not collaterally estopped from pursuing its claim, the Court is not granting summary judgment to ABB. Instead, the Court is merely allowing ABB to present evidence on the issue at trial, and ruling that the issue is one to be determined by the trier of fact (in this case — the Court) based on all relevant evidence.

. At the outset, the Court must apologize for the selection of language in the Gothaer Order. A fair and objective analysis of the Court’s order of June 4, 1996, shows that the ultimate holding in that order was that, in light of the broad “cover note,” ABB had an insurable interest at the time of the loss; and that Glukstad, 619 F.2d at 458, involved a Open Marine Cargo policy that may have been substantially different from that involved here. The seemingly inconsistent factual predicates between the case involved in Glukstad and that present here afforded a proper basis for rejection of Glukstad and invoked the long standing admiralty principles embraced by the Supreme Court since, at least, the late 19th century.
Unfortunately, the Court inappropriately and inartfully, used the following unnecessary language in its order of June 6, viz "this Court must, with great hesitancy, disagree with the Fifth Circuit's ruling in Glukstad .... ” Gothaer Order, at 17. This Court is, of course, bound by any binding appellate ruling of the Eleventh Circuit and may not, cannot and does not have the right to disagree with that ruling for the purpose of rejecting it. By this clarification of the Gothaer Order, the Court hopes that it has rectified this seemingly discordant recital and makes abundantly clear that if the factual and legal predicates in the case sub judice were the same as in Glukstad, the latter would compel a finding that "ABB does not possess the requisite insurable interest to obtain redress trader the policy.”

. The Eleventh Circuit in the en banc decision Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

. As the Court cautioned, however, "[t]hese factors are merely instructive and not dispositive.”

. However, as the rest of this Order makes clear, the Court does not believe that Glukstad directly involved interpretation of or application of federal admiralty law.

. Admittedly, Judge Edenfield was able to determine that the Georgia statute that conflicted with the maritime rule was inapplicable to the case before him. However, a reading of the decision leaves this Court with no doubt that Judge Edenfield’s holding is that even if the statute in question had been applicable, it would be preempted by federal maritime law. See Lexington, 686 F.Supp. at 327-29.

. Gothaer’s argument that, in fact, the Supreme Court in Hooper did not determine the meaning of "insurable interest” under federal admiralty law is unsupported. According to counsel, “contrary to the Court's conclusion, Hooper ... did not purport to have formulated its definition of an ‘insurable interest’ under federal admiralty law.”
Indisputably the Supreme Court, through analogies to other areas of insurance law, conclusively determined that in the marine insurance context, "insurable interest” would be legally defined as encompassing almost any pecuniary interest. Apparently, before Hooper there had been no occasion for legal interpretation of "insurable interest” in marine insurance policies. Nonetheless, the Court in Hooper was squarely confronted with that issue, making it necessary to define as a matter of law what the term encompasses "under federal maritime law.” The fact that the Court chose to define the term as it had historically been defined in other areas of law in no way lessens the fact that since Hooper, insurable interest has a fixed and readily understandable definition under federal maritime law.

. However, in a rehearing, York-Shipley did argue that it possessed a valid security interest. See note 14 below.

. As the Fifth Circuit stated in its decision vacating its original holding in York-Shipley:
. Our prior decision in this matter is premised on the supposition that appellee had no insurable interest in the shipment, whether by title or security interest and thus lacked standing. It is implicit in our decision that the insurance was purchased for the buyer to accommodate the C.I.F. shipment by appellee, the seller, and not for appellee's own interest. It is now apparent that the principal question in this case and one that has not been answered is whether appellee was insured at all.
York-Shipley. Inc. v. Atlantic Mutual Insurance Company, 476 F.2d 1283 (1973).

. Although under a different reading of Florida law than that conclusively decided in Glukstad.